# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| | |
|---|---|
| STEVEN McDOWELL, | |
| Plaintiff, | |
| v. | Civ. Action No. 04-6089 (KSH) |
| ADMINISTRATOR  LYDELL B. SHERRER; SERGEANT CRAIG SEARS; SCO CHARLIE WALLACE; SCO CHRISTOPHER CARSON; SCO DENNIS ROBINSON; SCO MARC WILLIAMS; SCO DOMINGO RIVERA; SCO BRIAN WILLIAMS; SCO KEVIN SEARCY; SCO ARNALDO BELO; SERGEANT CESAR DE LA CRUZ; SCO CARNELL CARTRELL; SCO EDWARD BONET; SCO RONALD TUCKER; SCO LEONARD WHEELER; SERGEANT DAVID ABDUS-SABUR, | **OPINION** |
| Defendants. | |

**KATHARINE S. HAYDEN, U.S.D.J.**

If a picture is worth a thousand words, two live-action videos are good for at least a million.  In this § 1983 action, plaintiff Steven McDowell ("McDowell"), a prisoner currently incarcerated at Northern State Prison ("NSP"), alleges that defendants, all New Jersey

1

Department of Corrections officials, violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  McDowell alleges that defendants, while conducting a "prison extraction," used excessive force in violation of the Eighth Amendment and thereafter violated the First and Fourteenth Amendments by retaliating against him for pursuing civil remedies in response to the extraction.  All remaining defendants now move for summary judgment. [1]  For the following reasons, the motion is granted.

## I.      JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because McDowell's complaint raises an issue of federal constitutional law and alleges a deprivation of constitutional rights by officers acting under color of state law.  See 42 U.S.C. § 1983.

## II.     STANDARD OF REVIEW

Under Rule 56(c), summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court is duty-bound to "view the facts in the light most favorable to the non-moving party and [must] draw all inferences in that party's favor."  Gray v. York Newspapers, 957 F.2d 1070, 1080 (3d Cir. 1992).  Summary judgment is inappropriate if there is evidence sufficient to

---

[1] On several occasions during discovery, McDowell voluntarily dismissed several defendants from the case.  (See D.E. # 69, 77, 78.)  On March 7, 2007, the Court entered an Order granting leave to defendants to file a motion for summary judgment.  (D.E. # 75.)  Pursuant to that Order, defendants filed this motion, asserting that various claims are subject to dismissal under Rule 12(b)(6) and in the alternative, that summary judgment should be granted. Because the Court has considered matters outside the submitted pleadings, and insofar as it understands the crux of defendants' argument to be essentially one for summary judgment, it will proceed under a pure Rule 56 analysis. See Fed. R. Civ. P. 12(d).

allow a reasonable jury to return a verdict for the non-moving party, <u>see Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986), or if the factual dispute is one which might affect the outcome of the suit under the governing law . . . ." <u>Id.</u>  The movant's burden, however, "may be discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  Additionally, the non-movant "may not rest upon mere allegations or denials of the . . . pleading"; instead, the non-movant, "by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." <u>Matushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

The foregoing standards are challenging enough.  Here, however, the Court has before it two videos, discussed more fully <u>infra</u>, and therefore must apply the governing summary judgment standards having witnessed *with its own eyes* the events at the core of this litigation.  In the Supreme Court's recent decision in <u>Scott v. Harris</u>, 127 S. Ct. 1769 (2007), the Court was asked to determine whether and to what extent a district court may use a video in adjudicating a summary judgment motion.  In that case, a § 1983 action alleging that police officers used excessive force while terminating a high-speed car chase, the Court explained how the pre-existing summary judgment framework must accommodate video evidence:

> When things are in such a posture, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion.  In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts.  There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question.  The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals. . . .  At the summary judgment stage, facts must be viewed in the light most favorable to the non-moving party only if there is a "genuine"

3

dispute as to those facts. As we have emphasized, when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott, 127 S. Ct. at 1775-76 (internal quotations and citations omitted; emphasis in original); see also Stasicky v. S. Woods State Prison, No. 03-369, 2006 U.S. Dist. LEXIS 63747, at *33 (D.N.J. Sept. 6, 2006) (relying on videotape in granting summary judgment to defendant prison officials on inmate's excessive force claim related to a prison extraction). This is not to say, however, that a court is unconstrained in its visual analysis and may "weigh the evidence and determine the truth of the matter" alleged by rendering its own interpretation of the videos. Anderson, 477 U.S. at 249. The Court must view the video in the light most favorable to McDowell in determining whether there is a genuine issue for trial. Having set forth the proper analytical framework, the Court is ultimately convinced by the videos and other evidence submitted that summary judgment is appropriate.

III.   **FACTUAL BACKGROUND**

The following facts are taken from the deposition testimony, the exhibits that are attached to the certifications of Thomas E. Kemble and Jason Schatz, and the June 1, 2007 affidavit of McDowell, together with the memoranda of law submitted for the instant motion.

### A.  November 8, 2004 Extraction

Steven McDowell is currently serving a 20-year sentence for armed robbery and weapons offenses; the sentence has a maximum expiration date of October 28, 2014.  (Kemble Cert. Ex. M (McDowell's Face Sheet and Progress Notes).)  In the early morning hours of November 8, 2004, NSP corrections officers conducted a prison extraction—in which an inmate is forcibly removed from the prison "tier"[2]—upon McDowell and his bunkmate Carlos Cruz.   (See State's DVD of extraction Nov. 8, 2004 ("State DVD").)  Senior Corrections Officer ("SCO") Leonard Wheeler testified in his deposition that either McDowell or Cruz had complained of stomach problems and trouble breathing to him.    (Kemble Cert Ex. B. (Wheeler Dep. 12:10-19).)  McDowell testified in his deposition that Cruz was ill and had been throwing up in the cell and asked Wheeler for assistance.  (Schatz Cert. Ex. 1 (McDowell Dep. 40:2-7).)  Wheeler opened the cell door so that the sick inmate could receive medical attention.  At that point, McDowell and Cruz emerged from their cell.  The state claims that both inmates feigned illness to get out of the cell.  (Wheeler Dep. 20:24-21:9.)  McDowell, however, claims he left the cell merely to assist his sick cellmate.  (McDowell Dep. 41:1-12.)  SCO Wheeler testified that both McDowell and Cruz were ordered to submit to handcuffing, and when they refused, were ordered to lock back into the cell.  (Wheeler Dep. 17:19-18:1.)  McDowell testified that he was trying to discuss

---

[2] The tier is the intermediate area immediately outside the individual cells and surrounding the innermost portion of the STGMU unit.  The tier and the rest of the unit are separated by a chain link fence.  Thus, an inmate outside of his cell and on the tier is separated from NSP officers, and can walk from cell to cell.  See State DVD.

Cruz's medical situation with the sergeant on duty.  (McDowell Dep. 42:4-7.)  He testified that the sergeant told the two inmates that "if you don't go lock in now, you are going to get fucked up."  (McDowell Dep. 41:17-24.)  Cruz admitted that they did not submit to handcuffing upon repeated requests by the officers.  Kemble Cert. Ex. C (Cruz Dep. 65:14-21).)  Standard protocol dictates that when an inmate requests to be escorted to the medical unit, he must first be handcuffed.  (Wheeler Dep. 17:19-20:9.)  Because the inmates refused to submit to handcuffing, they were then ordered to return to their cells, which they also refused to do.  (Wheeler Dep. 17:19-18:17.)  SCO Wheeler also testified that it is standard procedure to lock an inmate out of his cell if he refuses to be handcuffed or otherwise return to his cell because the inmate is then creating a disturbance.  (Wheeler Dep. 20:23-21:9.)  When inmates were locked out of their cell for disobeying an order to lock back in, it then became necessary to physically remove the recalcitrant inmates from the tier because, as Wheeler testified, the inmates then began to "roam the tier, walking around, talking and laughing."  (Wheeler Dep. 20:6-9; 23:2-6.)

Two heavily armed extraction teams were formed to remove McDowell and Cruz from the tier.  (Kemble Cert. Ex. D. (Report of Sgt. Sabur Nov. 8, 2004).)  One team was led by Sgt. David Abdus-Sabur and the other by a Sgt. Russo (who is not a party to this case).  Each extraction team member has a specified responsibility to safely extract a prisoner:  one team member leads the group with a large, full-length body shield to pin the inmate down, while the other four officers are tasked with securing each of his limbs.  (Schatz Cert. Ex. 3 (Sears Dep. 20:7-21:25).)  The officers receive annual training in the proper use of force when dealing with an inmate. (Sears Dep. 14:24-17:24.)

Prior to arriving at the tier, the teams assembled and were videotaped identifying themselves and stating the reasons for the ensuing extraction.  (See State DVD).  One member

can be heard stating that McDowell might have a weapon on his person. (See id.)   Back at the tier, Cruz allegedly asked a sergeant to permit him and McDowell to lock back into their cells rather than be extracted, but the sergeant refused to allow it.  (Schatz Cert. Ex. 2 (Cruz Dep. 17:10-18:11).)  McDowell claims they were warned by Sgt. Marquis Owens that extraction teams would be coming.  (McDowell Dep. 45:12-23, 48:10-23.)  The video captures McDowell and Cruz donning clear, full-length plastic garbage bags over their heads to protect themselves from the effects of pepper spray that they knew would be used against them.  (Cruz Dep. 66:11-18.).   These bags were given to them by another inmate in the unit, Omar Broadway ("Broadway"), approximately 45 minutes before the extraction teams arrived.  (Cruz. Dep. 66:8-18.)  McDowell and Cruz also put bedsheets around their ankles.  The state claims that the inmates did this to prevent their legs from being shackled, while McDowell claims the bedsheets were merely to minimize injuries from the extraction, having been told by another inmate that his ankles had been torn up in a similar incident.  (See State DVD; McDowell Dep. 46:12-20.)

As the extraction teams arrive, the State's video shows Sgt. Russo pepper spraying McDowell and Cruz (pursuant to extraction procedure) in an effort to avoid the need to use force.  (See State DVD.)  McDowell appears to have an object in his mouth resembling a mouthguard before the encounter commences.  (See State DVD.)  When the plastic bags prevent the effective use of the pepper spray, the two extraction teams then move into position—Sgt. Russo's team entering through the right gate of the tier and Sgt. Abdur-Sabur's team entering through the left.  As the teams move onto the tier, both Cruz and McDowell rip off their plastic bags and advance aggressively toward Russo's team.  (See State DVD).  Just before McDowell goes off screen, he can be seen raising his right arm as if to throw a punch.  (See State DVD.)  Russo then tackles Cruz to the ground.  Moments later, the team assigned to McDowell has him

completely covered.  Russo then departs the tier with a bloody nose.  McDowell is still obscured from vision but can be heard repeatedly exclaiming, "I'm not resisting," and immediately before he is placed on his feet he yells, "You're breaking my hand."  (See State DVD.)  He also claims an officer twisted his testicles.  (McDowell Dep. 59:19-60:10; 60:20-22.).

The state claims that McDowell continued to resist while on the floor and that any and all force used was appropriate and reasonable.  McDowell claims that his visibly bloodied face was caused by repeated kicks, punches, and nightstick jabs.  (McDowell Dep. 74:15-24; 59:1-4.)  The state denies that any officer beat McDowell, made his restraints too tight, or that any officer acquiesced in this behavior.  It denies any officer twisted his testicles.

All the while, fellow inmate Omar Broadway captured the action from his cell on his own camera, which he asserts was given to him by an unidentified NSP officer. (Schatz Cert. Ex. M (Omar Broadway Dep. 21:8-11).)  Broadway's position on the tier provides a complementary, down-the-tier camera angle of the initial events leading up to the confrontation and then the encounter itself.  (See Video of Omar Broadway ("Broadway DVD").)[3]  At the beginning of the Broadway DVD, approximately 25 minutes before the extraction teams arrived on the tier, McDowell can unmistakably be heard hurling expletives and taunts at members of NSP Internal Affairs officers (McDowell refers to these officers as "I.A.").  When the extraction teams arrive on the scene, McDowell and Cruz are standing in an athletic stance, visibly swaying in preparation for an ensuing battle. (See Broadway DVD.)  From there, Broadway's camera angle shows Russo's extraction team descending upon the inmates as McDowell unveils himself first

___
[3] The video (now in DVD format) was provided to McDowell by Broadway's mother, Lynne Broadway.  (Kemble Cert. Ex. K (Lynne Broadway Dep. 36:16-17).)   Broadway has subsequently gained some notoriety for his handiwork—after being smuggled out of the prison, the video made its way to a New York producer, was entitled "An Omar Broadway Film," and was screened at the Tribeca Film Festival later that year.

and leads Cruz in a counter-advance on the team.  For a split-second, McDowell disappears from sight; at that moment Cruz takes a wild swing, connecting squarely with Sgt. Russo's nose. Because both inmates move toward Russo's team and Sgt. Abdur-Sabur's team had not yet reached the inmates, the initial extraction assignments were jumbled and somewhat of a controlled melee commenced.  At least four officers topple Cruz until he is secured.  As the camera returns its focus to McDowell, the officer armed with the protective shield pins McDowell against the wall until his compatriots get him on the ground.  Again, McDowell can be heard yelling that he is not resisting.  (See Broadway DVD.)

Returning to the state's video, as the officers secure McDowell, they stand him up and lead him into an adjacent hallway.  He is led there by Sgt. Cesar De La Cruz and two other officers.  De La Cruz has his arm around McDowell's neck, but McDowell is otherwise walking without the need for support.  (See State DVD.)   McDowell again insists that he is "not resisting" as he is walked into the hallway.  Upon arriving at the hallway, he is then placed up against a wall.  Contrary to McDowell's contention, the State DVD shows that his face was not "rammed into the wall." (McDowell Dep. 63:4.)  McDowell claims he told the officers that he could not breathe or speak because he was being held too tight, and that he then blacked out. (McDowell Dep. 65:16-22.)  The state claims that Officer De La Cruz did not choke McDowell and that McDowell did not lose consciousness.  While it is unclear from the video how much pressure De La Cruz is applying to his neck, the video depicts De La Cruz and the other officers allowing McDowell to slump to the ground after approximately twenty seconds, where he remains for several minutes.  McDowell claims that he is unconscious, but the state disputes this. Regardless, McDowell is visibly breathing, and is unquestionably conscious moments later.  At

one point, the officer attending to McDowell on the floor conspicuously leans over McDowell to check his face.  (See State DVD.)

McDowell then receives medical treatment on the floor from Nurse Brenda Jordan, who arrived within four minutes after McDowell slumped to the ground.  Jordan cleaned off the blood on his face with a normal saline solution, at which point the lacerations to his face become visible.  (Schatz Cert. Ex. 6 (Jordan Dep. 38:1-23); State DVD.)  After receiving medical attention, the officers again stand McDowell up and perform an initial cursory search for weapons suspected of being on McDowell's person.  (See State DVD.)  After several minutes, he is brought to the shower stall area where he is stripped and again searched.  McDowell claims that during this search an officer inserted his finger between the cheeks of McDowell's buttocks, causing McDowell to jump.  (See State DVD.)  While it is not clear from the video whether this claim is accurate, McDowell does at one point briefly jerk upward, consistent with experiencing a finger in his rectum, which is consistent with a body cavity search.  (See State DVD.) After the search, McDowell is allowed to wash the pepper spray off his face.  He is then escorted back to the tier and returned to his cell naked, at which point the state's live footage of the extraction concludes.  (See State DVD.)

McDowell asserts that after the extraction, both he and Cruz were left in their cell naked and injured for nearly two weeks, though he admits that he received underwear after a period of four or five days.  He claims that they were refused clothing, medical attention, or administrative remedy forms with which they could make an internal complaint.  McDowell claims he suffered permanent injuries as a result of the extraction.  He says his vision was impaired, requiring him to wear glasses for the first time in his life.  He claims to have knots and lumps on his head, scarring around his eye, weakening of his left hand, and intermittent dizzy spells.  (McDowell

Cert. ¶ 5.)  Finally, McDowell claims to suffer nightmares, be in constant fear of further abuse, and experience trauma whenever he is forced to remove his clothes.  (McDowell Cert. ¶ 6.)

### B.  Pursuit of Administrative Remedies

After the incident, McDowell claims he attempted to file a grievance through the prison's administrative remedy procedures.   The procedures required an inmate to fill out an Administrative Remedy Form # C-45 and forward it to the administrative designate.  (Kemble Cert. Ex. J (McDowell Cert. Sept. 6, 2005 Ex. B (Administrative Remedy Procedure for STGMU)).)  The forms could be obtained from a housing unit officer, which could be the same officer against whom the complaint was being made.  (McDowell Sept. 6, 2005 Cert. ¶ 6.)  He claims he asked officers several times for forms, and even told them it was to grieve a minor infraction and not the November 8 incident, but the officers asked him why he needed the forms and refused to provide him with a form.  (Id. ¶ 7.)  He claims he had to resort to "fishing" the form from another inmate.[4]  (Id. ¶ 8.)  He also stated that the only way to submit a form is to hand it to an officer, as there is no secure mailbox within the unit where an inmate can deposit the forms.  (Id. ¶ 10.)  He claims that an officer tore up his forms when they were handed to him by another inmate.  (McDowell Dep. 82:8-14.)

Once he obtained the forms, McDowell said he filled out four copies of the forms.  (Id. ¶ 11.)  He gave two sets to a paralegal who visited the unit, one set to an inmate down the hall, and one set to a porter.  (Id. ¶ 11.)  He believes those forms were received by the administrative officer because guards began asking him if he had more to say about the charges he made.  (Id. ¶ 12.)  But he claims he never received a formal response.  (Id. ¶ 12.)  He also claims that copies of

---

[4] "Fishing" refers to the practice of throwing a weighted string under one's cell door across the prison floor in order to trap and retrieve papers that inmates desire to pass amongst one another.  (McDowell Sept. 5, 2005 Cert. ¶ 8.)

these forms disappeared during cell searches by prison guards.  (Id. ¶ 2.)  Cruz allegedly

experienced similar problems seeking redress.  (Cruz Dep. 34:23-35:19.)

McDowell prepared another set of forms on November 23, 2004 and submitted them in

the same manner as before.  (Id. ¶ 13-14.)  His form reads:

> I am hereby forwarding this administrative remedy on the inmate
> request form because there are no administrative remedy forms on
> the unit.  The reasons [sic] of this remedy, is surrounding an
> incident which took place on or about November 7, 2004 whereas I
> had been a victim of abusive and excessive force on behalf of the
> N.S.P. officer's extraction team and also suffered a deep cut above
> my right eye, cuts from shackles on my ankles and wrists, beat
> about the head and face with night sticks, and choked until I was
> unconscious, and was refused medical attention.  Please remedy
> this.

(McDowell Cert. Sept. 6, 2005 Ex. D.)  He also attached a typed form letter addressed to Devon

Brown, Commissioner of the Department of Corrections.  It reads:

> I, Steven McDowell # 403692, am hereby respectfully submitting
> this grievance remedy form regarding the incident which occurred
> on or about the date of _____ in which several   NSP
> officer/Staff members were abusive in their inappropriate
> misconduct toward prisoner Steven McDowell #403692 whereas
> he was severely beaten and stomped upon the head, face and body
> while in handcuff restraints.  I understand that certain measures
> and/or methods must be taken in the event a prisoner having to be
> subdued, but this prisoner was deliberately attacked and mistreated
> for know [sic] apparent reason at all, and so administrative action
> should be taken to remedy this on-going problem.

(McDowell Cert. Sept. 6, 2005 Ex. D.)  Despite asserting that the proper officials never

responded to his submissions, he acknowledges that he received a "Staff Corrective Action

Form" a few days later, which stated that the remedy form he submitted did not contain enough

information and asked him to "[p]lease be specific as to the reason for your request and/or attach

supportive documentation."  (McDowell Sept. 6, 2005 Cert. Ex. E.)     He claims he was

discouraged by the letter but nevertheless filed another remedy form and letter on December 3, 2004.  (McDowell Sept. 5, 2005 Cert. ¶ 16.)  McDowell was able to provide a copy of the letter, but claims the remedy form disappeared from his cell during a search.  (Id. ¶ 16.)  The letter is essentially the same as the November 23 letter, only he added the date of "Nov. 7, 2004" in the space previously left blank.  (McDowell Sept. 6, 2005 Cert. Ex. F.)  A few days later he received another Staff Corrective Action Form which stated that they had received his form but no attachment was included.  (Id. Ex. G.)  After receiving the response to his December 3 form and letter, he filed the original complaint in this action on December 13, 2004.  (Id. ¶ 19.)  Even after filing his complaint with this Court, McDowell filed one additional administrative remedy form for good measure on January 27, 2005.  It reads:

> I am hereby once again forwarding this administrative remedy for the fourth time, regarding an incident that occurred on Nov. 8, 2004 on the above unit whereas I had been a victim of excessive force while being extracted from the unit.  I suffered a cut under my right eye, ankles, wrist and was beat with night sticks in the head & face.  Can you stop ignoring my remedies, Please!

(McDowell Sept. 6, 2005 Cert. Ex. H.)

### C.  Alleged Retaliation by NSP Staff Against McDowell

McDowell alleges that after he filed this lawsuit, defendants began retaliating against him.  He alleges several incidents as evidence of retaliation.  He claims that in February and March of 2005, officers Williams and Rivera conducted cell searches where they destroyed personal property, religious books, and legal documents for McDowell's post-conviction relief application and this lawsuit.  (McDowell SJ Cert. Ex. 1; McDowell Dep. 94:14-25.)  He claims that because these documents were missing, he was unable to file for post-conviction relief.  (SJ Cert. ¶ 7.)  He also claims that on March 6, 2005, while on recreation in the prison yard, he was

13

maced by officers in response to a fight that broke out in the yard and the officers did not provide him with medical assistance.  (Id. ¶ 8-9.)  He states that he was standing on the other side of the yard and was not involved in the fight.  (Id. ¶ 9.)  He claims officer Searcy told him that he had "become a target" and that he would be charged with disciplinary infractions stemming from the yard fight.  (Id. ¶ 10.)  McDowell was written up for the alleged assault.  (Schatz Cert. Exs. 23, 24.)

McDowell challenged the charges and a hearing was held.  (S.J. Cert. ¶ 12.)  The hearing was held on the housing unit and McDowell was locked in a cage, as was usual for these types of proceedings.  (McDowell Dep. 115:8-11.)  During the hearing, McDowell said he intended to cross-examine SCO Barnes-Roberts on her testimony that he was directly involved in the fight.  (McDowell Statement of Facts ¶ 89; Barnes-Roberts Dep. 30:3-13.)  Instead, he claims that during the hearing, SCOs Williams and Rivera were "tearing up his family photos, destroying his legal documents, walking on his clothing and throwing away his food."  (McDowell Statement of Facts ¶ 89.)  He claims Officer Rivera took his watch and said "see if your lawyer gets this back for you, punk."  (McDowell Dep. (118:12-13.)  The state admits they conducted a search but denies that they destroyed any property or vandalized his cell.  (Williams Dep. 47:9-15, Oct. 5, 2006.)  McDowell claims he was never afforded the opportunity to question Barnes-Roberts because he was distracted by the search of his cell.  (McDowell Dep. 117:17-118:7.)  Frustrated, McDowell kicked the cage he was in, causing an adjoining shelf to bump into SCO Rivera.  Rivera filed an assault charge against McDowell and he was found guilty.  (Schatz Cert. Exs. 27, 28; McDowell Dep. 120:1-11.)  McDowell unsuccessfully appealed the sanctions levied against him based on the March 2005 fight and the incident at the disciplinary hearing.  (Schatz Cert. Exs. 25,26, 29, 30.)

McDowell also alleges other forms of retaliation.  He claims officers began calling him "snitch," "stool pigeon," and "Agent McDowell" in March of 2005.  (S.J. Cert. ¶ 11.)  He also says that on June 24, 2005, SCO Arnaldo Belo destroyed a remedy form that McDowell handed him which said Belo had substituted his regular medication for another drug that gave him stomach pains.   (McDowell Statement of Facts ¶ 98.)   He claims Belo called him a "troublemaker," "snitch," and "asshole," and blew cigarette smoke in his face.  (S.J. Cert. ¶ 18; McDowell Dep. 106:3-11.)  The state denies Belo made these comments or threw out the remedy form.  That same day, McDowell states a fight broke out in an adjacent yard.  He says Officer Sears immediately accused him of being involved, saying "I know you have something to do with it."  (McDowell Dep. 106:15-16.)  McDowell claims Searcy told him he hated his guts, that he would charge McDowell "in relation to the fight, that he had heard about my correspondence with the Court, and that I would pay for it."  (S.J. Cert. ¶ 20.)  He claims Searcy also said "you're a fucking joke.  I don't care who you tell.  We can handle this on the street."  (Id.)  He was charged with "Encouraging Others to Riot."   (S.J. Cert. ¶ 21.)   He claims that the fight participants said he had nothing to do with the fight, but he was found guilty based on the statements of Officer Weaver, who McDowell alleges was not present in the yard at the time of the fight.  (S.J. Cert. ¶ 22: Schatz Cert. Ex. 32.)  He unsuccessfully appealed this charge.  (Schatz Cert. Exs. 33, 34.)

McDowell also claims that Sherrer referred to him as "the lawsuit guy" when he visited the unit in the fall of 2005.  (S.J. Cert. ¶ 23.)  He claims Sherrer threatened to send him to prison in Trenton with bad conditions.  (Id.)  McDowell said he tried to talk to Sherrer about problems with ensuring Administrative Remedy forms reached their proper destination, but Sherrer walked

away and said "don't tell me how to run my unit." (S.J. Cert ¶ 24.) The state denies these allegations.

## IV. DISCUSSION

McDowell invokes 42 U.S.C. § 1983, which provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law. See Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000) (citing Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). Prison officers subject themselves to civil liability under § 1983 when they, acting under color of state law, violate an inmate's federal constitutional rights. See Ford v. Mercer County Corr. Ctr., 171 Fed. App'x 416, 418 (3d Cir. 2006). Here, McDowell asserts violations of his First, Fourth, Eighth, and Fourteenth Amendment rights as a result of the November 8 extraction from the STGMU. (Third Amended Compl. ("Compl.") ¶¶ 121-25.) He also alleges that the NSP officers violated his First and Fourteenth Amendment rights by taking retaliatory action in response to his pursuit of civil remedies regarding the extraction. (Compl. ¶¶ 126-30.) Finally, McDowell seeks independent relief under Article I of the New Jersey Constitution (Compl. ¶¶ 131-34.)[5]

### A. Fourth Amendment

In his complaint, McDowell cursorily alleges that the defendants violated his Fourth Amendment rights. (Compl. ¶ 122, 127). He does not specify how any of the defendants' actions even concern the Fourth Amendment, let alone violate it. Moreover, he does not advance a Fourth Amendment theory in his opposition briefs submitted for the instant motion. (See McDowell Opp. Br. and McDowell Supp. Opp. Br.) To the extent, however, that McDowell

---

[5] McDowell has voluntarily dismissed Counts Four, Five, and Six of the Third Amended Complaint, which alleged common law tortious conduct against certain defendants. (See D.E. # 78; Compl. ¶¶ 135-147.) McDowell's claim that defendants violated his rights under Article I of the New Jersey Constitution apparently still remains intact.

alleges in the complaint that the defendants' actions constituted excessive force in violation of the Fourth Amendment, he cannot prevail.  In the prison context, the Eighth Amendment is the proper analytical lodestar, not the Fourth.  See, e.g., Whitley v. Albers, 475 U.S. 312, 327 (1986) (the Eighth Amendment, "which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners . . . where the deliberate use of force is challenged as excessive and unjustified.").  Furthermore, with respect to any allegedly overzealous searches of McDowell's cell, the Court notes simply that "the Fourth Amendment has no applicability to a prison cell." Hudson v. Palmer, 468 U.S. 517, 536 (1984).  Because the Court can discern no other possible Fourth Amendment violation from the facts alleged and the proofs submitted, summary judgment is appropriate with respect to McDowell's § 1983 action insofar as it relies on the Fourth Amendment.

**B.  Eighth Amendment**

1.  Claims Asserted by McDowell

The Eighth Amendment prohibits "cruel and unusual punishment." McDowell asserts that defendants violated his right to be free from this punishment in essentially two ways.  First, McDowell argues that the officers went constitutionally overboard by utilizing excessive force during the prison extraction.  Specifically, he alleges that immediately after the extraction teams took him down, the officers continued to punch, kick, and jab him with a nightstick.  See McDowell Supp. Opp. Br. at 3-4.  Additionally, he claims that an officer twisted his testicles and nearly broke his hand. Id. at 4.  Upon being led from the tier into the adjacent hallway, McDowell argues that he was also choked into unconsciousness.  Id.  Finally, he claims that

17

while strip-searching him before allowing him to shower, an officer inserted his fingers into McDowell's buttocks.  Id. at 5.

Second, McDowell argues that defendants subjected him to inhumane prison conditions. He claims that he received inadequate medical treatment as a result of the injuries exacted upon him during the extraction.  See McDowell Supp. Opp. Br. at 6-7.  He asserts that this lack of care inflicted (or prolonged) unnecessary—and thus cruel and unusual—pain.  Id.  He claims that after the extraction, he was returned to his cell with an open cut around his eye that went unattended. Id. at 4, 6-7.  McDowell says that despite repeated requests for medical treatment, he received no medical treatment for weeks.  Id. at 10-12.  He claims that he was placed back in his cell naked, and went without clothing for five days, at which point he was able to obtain underwear from another inmate, and went almost another week without any other clothing.  Id. at 6, 11.

Defendants, in turn, counter McDowell's claims in three principal ways.  First, they deny the factual allegations as interpreted by McDowell.  Defendants dispute the extent to which, if at all, McDowell was punched, kicked, jabbed with a nightstick, choked, or had his testicles twisted.  Of course, for purposes of this motion, the Court will not blindly credit defendants' bare refutation of McDowell's allegations.  See Anderson, 477 U.S. at 248.  Second, defendants argue that any and all force used in connection with the extraction was constitutionally permissible given the hostile circumstances of extracting two troublesome inmates from a high-security prison unit.  Finally, defendants argue that they cannot be held liable because they are cloaked with qualified immunity.

2.  <u>Qualified Immunity</u>

Under the doctrine of qualified immunity, officers performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Qualified immunity analysis is a two-pronged test.  A court must first ask whether the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right?  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  Then, *only* if the court answers the threshold question affirmatively should it proceed to the second prong and determine whether the right was clearly established, i.e., "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  <u>Id.</u>  Thus, the Court must first determine whether a constitutional infringement has been satisfactorily alleged to create a genuine issue of material fact, an inquiry upon which the Court now embarks.[6]

3.  <u>Analysis</u>

Contemporary Eighth Amendment jurisprudence recognizes that what is cruel and unusual varies according to the nature of the alleged constitutional violation.  <u>Hudson v. McMillian</u>, 503 U.S. 1, 5 (1992) (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 320 (1986)).  The Supreme Court, therefore, has formulated varying tests applicable in different situations.  The bedrock fundamental principle, however, remains that after incarceration, only "the *unnecessary*

---

[6] In <u>Scott</u>, the Supreme Court noted the criticism of <u>Saucier</u>'s "rigid order of battle" by reflecting that the Court had not always been unyielding in requiring the constitutional analysis to come before the qualified immunity question in every case.  127 S. Ct. at 1774 n.4.  However, the <u>Scott</u> Court found no need to revisit <u>Saucier</u> because video evidence, as here, made the first prong a relatively straightforward question.  <u>Id.</u>  Thus, adherence to the <u>Saucier</u> framework was the "better approach."  <u>Id.</u>

*and wanton infliction of pain*" contravenes the edicts of our Constitution.   Ingraham v. Wright,

430 U.S. 651, 670 (1977) (emphasis added).

### a.  Excessive Force

Where a prisoner alleges that officers used excessive force upon him, "the question

whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns

on whether force was applied in a *good faith effort to maintain or restore discipline or

maliciously and sadistically for the very purpose of causing harm.*"   Hudson, 503 U.S. at 6

(quoting Whitley, 475 U.S. at 320-21) (emphasis added).   The good faith standard recognizes

that "officials confronted with a prison disturbance must balance the threat unrest poses to

inmates, prison workers, administrators, and visitors against the harm inmates may suffer if

guards use force."   Id. (quoting Whitley, 475 U.S. at 320).   This balancing act must be

accomplished "in haste, under pressure, and frequently without the luxury of a second chance."

Id.   For this reason, when the

> ever-present potential for violent confrontation and conflagration
> ripens into *actual* unrest and conflict, the admonition that a
> prison's internal security is peculiarly a matter normally left to the
> discretion of prison administrators [is one that] carries special
> weight.

Whitley, 475 U.S. at 321 (internal quotations and citations omitted; emphasis in original).   Thus,

prison officials, including guards and officers implementing internal prison security measures,

should be "accorded wide-ranging deference in the adoption and execution of policies and

practices that in their judgment are needed to preserve internal order and discipline and to

maintain institutional security."   Hudson, 503 U.S. at 6-7; see also Johnson v. Glick, 481 F. 2d,

1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in

the peace of a judge's chambers, violates a prisoner's constitutional rights.").   The standard is

one of "obduracy and wantonness, not inadvertence or error in good faith." Whitley, 475 U.S. at 319. Because every prison confrontation will present its own set of circumstances and challenges, courts look to several factors in determining whether a given action was taken in good faith or with wanton malice, including: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the injury inflicted. Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000).

McDowell urges the Court to focus on individual actions by the NSP officers when taken in isolation. For example, McDowell argues that when the officers were on top of him on the tier, any punch or nightstick jab was ipso facto a constitutional violation simply because McDowell had already been secured. To be sure, the officers used significant force in subduing McDowell and Cruz, and the videotape shows that they continued to use force after McDowell was shackled and handcuffed. But the officers were maintaining order in the maximum security facility in the course of, and after, an incident in which McDowell and Cruz, as revealed by the videos, had visibly taunted corrections officers, flouted prison rules and disobeyed commands, shielded themselves from pepper spray, and had further invited a violent confrontation. The Court declines to engage in a freeze-frame constitutional analysis and second-guess every individual movement of each defendant without considering the attendant circumstances. Instead, the proper inquiry focuses the Court's scrutiny on the continuum of events as they unfolded from the beginning of the incident to the end. Viewed thus, in context and under the totality of the circumstances, defendants' actions were reasonable and taken in good faith. The videos "blatantly contradict" the story spun by McDowell—that the officers maliciously and sadistically used force in extracting him. See Scott, 127 S. Ct. at 1776.

21

Upon being released to the tier for accompaniment to the medical unit, McDowell and Cruz refused to submit to handcuffing, pursuant to prison policy.  These inmates had no right to roam the high-security tier.   Thus, activating prison extraction procedures was perfectly legitimate, a fact to which McDowell does not dispute.  The Court notes that it was the inmates' own behavior that precipitated the extraction in the first place.

Together, the State DVD and the Broadway DVD place the entire chain of events of November 8, 2004 into proper context.  Contrary to McDowell's assertion that he was simply attempting to explain to the officers on the tier that his cellmate needed medical attention, the Broadway DVD indisputably catches McDowell lacing profanities and taunts at the "IA" officers long before the extraction teams arrived.  Whatever asking for medical assistance on behalf of one's cellmate looks like, what appears on the video is not it.  Even if McDowell did have sincere intentions to assist Cruz to the medical unit, he was under an obligation to submit to handcuffing, and not to engage in a belligerent back-and-forth with prison personnel. Additionally, audible on the Broadway videotape are the shouts, cheers, and jeers of the other inmates housed at the STGMU.  Thus, the video produced by his fellow inmate flatly contradicts the innocuous version of McDowell's tale—even before the teams arrived on the tier, the prison unit had become a highly charged atmosphere with two dangerous inmates out of their cell.

As the state's video begins below the tier, we hear a member of the extraction team mentioning that McDowell could have a weapon on him.  Thus, before the team even gets to the tier, they are reasonably concerned about the particular inmate whom they will be extracting. Once the team makes it to the tier, standard extraction procedure commences.  The video shows officers first attempting to talk to the inmates.  To no avail, the video shows Sgt. Russo spraying the inmates with pepper spray—the next step in the extraction progression.  This effort to subdue

the inmates without violence was ineffective because the inmates had been supplied with plastic bags to place over their heads and bodies by Omar Broadway.  It was Broadway's cell that Cruz and McDowell stood in front of throughout most of the pre-extraction interaction with the NSP staff.  And Broadway is the same inmate who captured the ensuing struggle on a smuggled camcorder and then managed to submit the video to a New York producer, where it ultimately qualified for entry in a popular film festival.  McDowell and Cruz positioned themselves close to Broadway's cell while Broadway taped and commented on the circus atmosphere, and the two inmates themselves were responsible for the incident further ripening into a full-blown extraction.  All this is part of the "totality" of the circumstances.

As the extraction teams descend on the inmates, the State DVD shows McDowell, with Cruz closely behind, quickly tearing off his plastic bag and rushing at Sgt. Russo's team.  We see McDowell begin to raise his arm as he approaches the team.  Shifting quickly to the Broadway DVD, as the inmates reach Sgt. Russo's team, Cruz lands a right hook to Russo's nose before being tackled to the floor.  Then, an officer with the aforementioned body shield successfully knocks McDowell to the ground, at which point the team members cover him.  Because neither video shows McDowell actually throwing a punch, the Court will not infer that McDowell threw one.  Nonetheless, the videos do capture his aggressive advance on the extraction teams.

Given the events prior to the initial physical encounter between the inmates and extractions teams, it is not surprising that the teams predetermined that force was necessary to take the inmates down.  As the adversaries engaged, however, the use of force became not only reasonable, but *necessary*.  The videos establish that McDowell, at the very least, aggressively approached the team.  Cruz undeniably hit Sgt. Russo in the face.  The officers were thus entitled to respond with enough force to take McDowell and Cruz to the ground and restrain them.  The

videos further confirm that the teams used no more force than was necessary to accomplish this goal.

In <u>Camp v. Brennan</u>, 54 Fed. Appx. 78, 80 (3d Cir. 2002), the Third Circuit affirmed the trial court's grant of summary judgment on an excessive force claim related to a prison extraction.  Much like the facts of this case, the inmate in <u>Camp</u> refused to obey an order to walk through a particular doorway.  <u>Id.</u>  The Court found that in doing so, the inmate created the confrontation and that reasonable force was applied—force that included the use of pepper spray, physical restraint, and a stun gun which left four dime-sized burns on his body.  <u>Id.</u>  Similarly, McDowell and Cruz provoked the extraction, and the videos show that the provocation was met with force reasonably necessary to stifle the altercation.  Therefore, the Court finds as a matter of law that the force used to take the inmates down was exercised in good faith, with sound judgment, and without malice or wanton desire to inflict unnecessary pain.  <u>See Whitley</u>, 475 U.S. at 320-21.

Nor is the ensuing use of force against McDowell unconstitutional.  Applying the factors set forth in <u>Brooks</u>, the need for application of force was great, given the aggression the inmates demonstrated; the threat to the safety of officers in the tier was high (for example, Sgt. Russo's nose had been bloodied by a wild punch from Cruz); and no more force than was necessary to ensure McDowell remained subdued was applied.  <u>Brooks</u>, 204 F.3d at 106.  McDowell argues that when the extraction teams take him to the floor and restrain him, he is punched, kicked, beaten with a nightstick, has his testicles twisted and his hand nearly broken.  Because, he claims, neither video contradicts that these alleged atrocities occurred, his version is to be accepted or, worst case, the underlying facts are in dispute and require further factfinding.  But the violence of the episode was predictable and any reasonable viewing of the DVDs leaves the

lasting impression that perhaps Broadway, and certainly McDowell and Cruz, were in "bring it on" mode.  In an extraction like this one, the officers, assembled in the middle of the night to deal with belligerent prisoners in full view of other cells where gang members are housed, were not obligated to take all reasonable steps to mitigate the effect on the inmates being extracted. They were under a constitutional obligation not to exacerbate it, but that is a different issue.

Having just witnessed Cruz land a blow to Sgt. Russo's nose, it is understandable that the officers determined that force was reasonably necessary to protect themselves against further attack.  While McDowell complains that Administrator Sherrer testified that the use of nightsticks is appropriate "only if the inmate is lying down and kicking or doing something that the officer felt it put a danger, a lethal danger to himself or staff," (McDowell Supp. Opp. Br. at 5; Schatz Cert. Ex. 8 (Sherrer Dep. 28:13-20).), New Jersey prison policy states that non-deadly force (which includes the use of a baton) is justified when, under the totality of the circumstances, such force is objectively reasonable to "prevent or quell a riot or disturbance." Schatz Cert. Ex. 15 (N.J. Admin. Code. § 10A:3-3.3(a)(5).  Even assuming, however, that the officers violated standard policy by using nightsticks, the fact remains that the prevailing legal question is whether that action was undertaken in good faith and without a malicious desire to cause unnecessary pain.  McDowell cannot meet that standard here.

Additionally, noticeably absent from the administrative grievance that McDowell filed after the extraction is his allegation that the NSP officers twisted his testicles while restraining him.  See McDowell Cert. Sept. 6, 2005 Exs. D, F.  Even after he initiated this action, he submitted still another grievance form that also left out any such accusation.  See McDowell Cert. Sept. 6, 2005 Ex. H.  The Court finds it telling that a major component of his excessive

force theory was missing from the otherwise detailed grievance forms filed in the *immediate aftermath* of the extraction, when the alleged abuse was still fresh in his mind.

Finally, the videos contradict the entire tenor of McDowell's account.   See Scott, 127 S. Ct. at 1776.  The DVDs show the team members on top of McDowell for no longer than is necessary to place restraints on his hands and feet.  The officers are concerned with securing McDowell and removing him from the tier.  The State DVD shows that at the time McDowell screams his hand is being broken (which, the Court notes, was in fact not broken), his hands are being placed in handcuffs behind his back, immediately before being led into the adjacent hallway.  For all of the above reasons, the Court finds that the force applied to McDowell once he was initially restrained was constitutionally permissible.

McDowell also argues that the actions taken after he was tackled, handcuffed, and removed from the tier were unconstitutional, contending that he was choked into unconsciousness and that an officer inserted a finger into his buttocks.  McDowell cites Graham v. Conner, 490 U.S. 386, 396 (1989), for the proposition that because McDowell repeatedly exclaimed to the officers that he was not resisting, any further use of force was necessarily exercised for the sole purpose of causing pain.  But Graham is factually and legally distinguished from the events of November 8, 2004.  The plaintiff in that case alleged excessive force was used against him during an investigative stop outside a convenience store.  Id. at 388-89.  Graham had nothing to do with force levied upon an incarcerated individual inside a prison's walls.  The Court noted that when analyzing the use of force under the Fourth Amendment's reasonableness standard, one factor may be "whether [the plaintiff] is actively resisting arrest or attempting to evade arrest by flight."  Id. at 396 (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).  The

26

Court then expressly distinguished Fourth Amendment analysis from Eighth Amendment scrutiny, stating that the "less protective [and subjective] Eighth Amendment standard" plays no role in deciding whether a particular seizure was objectively reasonable under the Fourth Amendment.  Id. at 397-98.

The lesson to be drawn is that the Court is not determining whether the officers "reasonably" applied force after McDowell was restrained and on his feet, so whether McDowell was or was not resisting is not the focus.  Instead, the crucial question is whether the alleged chokehold was executed with a wanton desire to cause pain?  Examining the circumstances, the officers had just extracted McDowell in a violent confrontation and immediately led him into the hallway, and thus could not know what had happened to Cruz.  Audible on the State DVD are the other officers' commands to Cruz in the same hallway.  It is therefore unsurprising that De La Cruz placed McDowell up against the wall in to keep him separated from Cruz and maintain the security of the STGMU.  The video also shows that De La Cruz did not "ram[] his face into a wall."  McDowell Supp. Opp. Br. at 4.  And while there is a dispute about whether De La Cruz placed McDowell in a chokehold or that he lost consciousness, see id., the State DVD manifestly disproves that any such maneuver was done so with malice or wanton bad faith.  The officers are careful when they place him on the ground, and keep their hands on his back to monitor his breathing.  They call for a nurse who arrives within four minutes.  This sequence of events fails to support a finding of wanton malice.

Moreover, while chokeholds might be generally discouraged, see McDowell Supp. Op. Br. at 5, they are not per se unconstitutional.  See, e.g., Ort v. White, 813 F.2d 318, 324 (5th Cir. 1987) (citing Williams v. Kelley, 624 F.2d 695 (5th Cir. 1980) (discussing a prior panel's upholding of a fatal chokehold as constitutional; inmate's claim dismissed because the situation

27

"necessitated spontaneous reaction, and defendants acted without the benefit of hindsight . . . . In any event, it is clear that the hold was not used to inflict harm on [plaintiff], but was applied in a good faith effort to maintain or restore discipline.")).   Under the circumstances presented here, the Court is unpersuaded that, granting all inferences in McDowell's favor, a cognizable Eighth Amendment claim can be made out.   Under Brooks, at the time of the purported chokehold, the continuing need for force remained high, given that both Cruz and McDowell were both in the immediate vicinity of each other; that need was reasonably perceived by the officials, because they had only minutes before engaged in a violent exchange with the two inmates; the extent of the injury inflicted by the alleged chokehold was slight because at worst, the video shows McDowell unconscious for a matter of seconds; and significant efforts were made by the officers to temper the severity of the force used, because the officers responded immediately to McDowell's alleged unconsciousness with appropriate care and concern.   Outstanding as well was the possibility that McDowell still had a weapon on his person.

Finally, McDowell's claim that an officer inserted a finger into his buttocks during the strip search need not detain the Court for long.   The State DVD shows a strip search of McDowell's naked body.   The video does not show one way or the other whether or to what extent the officer performing the search inserts his finger into McDowell's buttocks.   McDowell does jump at one point, which suggests that he was surprised.   Nevertheless, the video demonstrates the officers' concern that McDowell might have had a weapon, and therefore they were warranted in briefly checking any area in which a weapon could be secreted.   The video also proves that any alleged insertion was brief and taken without any genuine risk of inflicting unnecessary pain or humiliation.   Thus, under the circumstances portrayed by the video, the insertion of a finger into his buttocks was constitutionally permissible because it was pursuant to

28

a reasonable search for weapons.  See Brown v. Blaine, 185 Fed. App'x 166, 169-70 (3d Cir. 2006) (in upholding as reasonable a prison cavity search, stating, "while we recognize that [appellant] may have suffered embarrassment and humiliation while the search was being conducted, we cannot conclude that [appellant's] constitutional rights were violated by the search procedures employed. . . .").

In Isby v. Duckworth, No. 97-3705, 1999 U.S. App. LEXIS 7823 (7th Cir. April 21, 1999), the Seventh Circuit upheld the grant of summary judgment where a rectal cavity search of an inmate was performed by a prison doctor in an examination room after he had been extracted from his cell following reported gunshots in the prison.  The Court stated that

> [e]ven though the strip search failed to recover any weapon, that does not mean it was an unreasonable precaution at the time. The prison officials had every reason to conclude that the more intrusive rectal cavity search was necessary to ensure that a weapon (or parts of it) had not eluded detection. We hesitate to second-guess their judgment where security issues are at stake, especially in light of the extraordinary ability of some prisoners to secrete an array of unlikely objects in their body cavities, including knives, drugs and hacksaw blades.

Id. at 6.

In sum, the force employed by the NSP officers under the circumstances was at all times undertaken in good faith and without wanton malice or a sadistic design to cause pain.  "The protection afforded by the Eighth Amendment is limited," Ingraham, 430 U.S. at 669-70, placing a high burden on McDowell to make out a viable claim of cruel and unusual punishment.  The Court finds that he has failed to adduce proof of unconstitutionally excessive force sufficient to withstand summary judgment.  Upon entering the tier, the extraction teams were confronted with a highly charged atmosphere.  The two videos taken irrefutably show the tactical application of force in response to a serious and immediate threat under circumstances that required security to

be maintained unquestionably and consistently.   This Court is particularly ill-positioned to "critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance," Farmer v. Hayman, No. 06-3084, 2008 U.S. Dist. LEXIS 2241 at *18 (D.N.J. Jan. 11, 2008) (quoting Whitley, 475 U.S. at 319).   Moreover, at no point do the videos "support a reliable inference of [malice or] wantonness in the infliction of pain." Whitley, 475 U.S. at 322.   Because the officers' actions on November 8, 2004 were "part and parcel of a good-faith effort to restore prison security," id. at 326, the conduct of the prison personnel did not constitute excessive force in violation of the Cruel and Unusual Punishment Clause.

### b. Inhumane Prison Conditions

A different legal standard applies to Eighth Amendment claims charging inhumane prison conditions.   Prison officials are under a constitutional obligation to "ensure that inmates receive adequate food, clothing, shelter, and medical care . . . ."   Farmer v. Brennan, 511 U.S. 825, 832 (1994).   But because the Constitution "does not mandate comfortable prisons," and even permits prison "conditions [that] are restrictive and even harsh," Rhodes v. Chapman, 452 U.S. 337, 347, 349 (1981), the legal threshold is one of "deliberate indifference to inmate health or safety" before civil liability will attach.   Farmer, 511 U.S. at 834.   A "prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'"   Id. (quoting Rhodes, 452 U.S. at 347).   Deliberate indifference is a culpability level more blameworthy than mere negligence, but something less than acts taken for the very purpose of causing harm.   Id.   The Supreme Court has required a two-pronged showing of both objective and subjective indifference:

> [A] prison official cannot be found liable under the Eighth
> Amendment for denying an inmate humane conditions of
> confinement unless the official knows of and disregards an
> excessive risk to inmate health or safety; the official must both be
> aware of facts from which the inference could be drawn that a
> substantial risk of serious harm exists, and he must also draw the
> inference.

Id. at 837.

Under this two-pronged test in the medical care context, a court must inquire whether a prison official has demonstrated "deliberate indifference to the *serious* medical needs of [a] prisoner." Estelle v. Gamble, 429 U.S. 97, 105 (1976) (emphasis added); see also Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995). The Third Circuit has held that deliberate indifference exists where "prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury," Monmouth Cty. Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (citing Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976)), where "knowledge of the need for medical care is accompanied by the intentional refusal to provide that care," id. (citing Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir. 1985)), where necessary medical treatment is delayed for non-medical reasons, id. (citing Ancata, 769 F.2d at 704), or where prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates. Id. at 347 (citing Todaro v. Ward, 565 F.2d 48, 53 (2d Cir. 1977)).

A "serious" medical need is one that has either been "diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Id. at 345. The Third Circuit stated in Lanzaro that "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the

provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment." Id. at 348.

The conditions of an inmate's immediate confinement are also judged on the deliberate indifference standard.  That is, if prison officials subject the inmate to conditions that are repugnant to contemporary standards of decency and are imposed without any penological justification, the Eighth Amendment has been violated.  See Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995).

The Court grants defendants' motion for summary judgment with respect to McDowell's inadequate medical treatment claim.  While McDowell complains that he was denied medical care for a month, see McDowell Opp. Br. at 8, the record indicates that he was treated at the scene by Nurse Brenda Jordan, who applied standard saline solution to the his cuts.   Kemble Cert Ex. I (Jordan Dep. 38:7-39:4).   Nurse Jordan also submitted a report concerning the incident, in which she states that she "examined by medical, small cut noted (1) below eyebrow, and cut noted on (2) forehead.  Inmate remained in hand and ankle cuffs no other bruises or cuts noted."  Kemble Cert Ex. H (Jordan Special Report).  Two conclusions can be gleaned from this report and the other submissions of the parties.  First, the record contradicts McDowell's account that he was *denied* any medical treatment, because a trained nurse inspected him and noted no significant injuries other than the cuts on his face, for which she then treated him.  Additionally, McDowell was subsequently examined and treated for the alleged injuries by a prison doctor, who reported "no dizziness, weakness, or other neurological changes" as a result of the alleged blows to the head.  The doctor also referred him for a hand x-ray, and described McDowell as having "difficulty making a fist with hand," but that he had "full range of motion on all fingers." See Schatz Cert Ex. 17.   The record therefore reflects that McDowell was afforded medical

32

treatment after the extraction.  And while McDowell might "have preferred a different course of treatment, and complains that he is 'still with pain,' his dissatisfaction does not establish a cause of action."  Baez v. Stine, 260 Fed. App'x 494, 497 (3d Cir. 2008).

The Court notes that a month went by between Nurse Jordan's on-the-spot medical attention and McDowell's visit to the doctor.  Again, applying the standard of deliberate indifference, the record evidence McDowell has adduced simply does not support a constitutional violation.  The doctor eventually did examine him; he did not offer evidence of permanent medical conditions created or prolonged by a delay in treatment.  The high bar set under the relevant cases and the underlying legal inquiry has not been met here.  Prison officials were slow to provide follow-up medical review of McDowell's claimed injuries.  They were not, however, "deliberately indifferent" to any "serious" medical conditions, as that standard is construed—it requires more than that medical care was temporarily withheld.  McDowell has failed to show how the "denial [of treatment] expose[d] [him] to undue suffering or the threat of tangible residual injury," Lanzaro, 834 F.2d at 346, or that defendants' "knowledge of the need for medical care [wa]s accompanied by the intentional refusal to provide that care," id., or that "*necessary* medical treatment [wa]s delayed for non-medical reasons," id. (emphasis added).

Second, because Nurse Jordan examined McDowell immediately after the extraction and thereafter submitted a report showing no concern for further significant injury, prison personnel were reasonable in relying on her conclusion.  Where one's alleged injuries escape the trained eye of a prison nurse, the Court fails to see how the injuries could simultaneously be serious, i.e., "so obvious that a lay person would easily recognize the necessity for a doctor's attention." Lanzaro, 834 F.2d 326 at 347.  Under that analysis, any delay between the time of the extraction and subsequent professional examination was objectively reasonable, and thus constitutional.

33

See Farmer, 511 U.S. at 844 ("Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").  For the above reasons, the Court finds as a matter of law that defendants were not deliberately indifferent to the serious medical needs of McDowell, and thus grants summary judgment with respect to this claim.

Nor does the claim that he was left in his cell for approximately five days without clothing rise to the level of a constitutional transgression.  The Third Circuit's disposition in Camp v. Brennan, 54 Fed. App'x. 78 (3d Cir. 2002) forecloses recovery for McDowell.  In upholding a district court's grant of summary judgment on a conditions-of-confinement claim, the Third Circuit discussed the import of the Supreme Court's seminal decision in Farmer v. Brennan:

> Post-Farmer, "prison officials do not violate the Eighth Amendment by placing a prisoner in a strip cell unless they deny the inmate 'the minimal civilized measure of life's necessities,' and knowingly disregard an excessive risk to the inmate's health or safety created by such a deprivation."  In Williams [v. Delo, 49 F.3d 442, 446 (8th Cir. 1995)], an inmate violently assaulted his wife while she was visiting him in prison. Officials confined him to a 'strip cell' for four days without any clothes, bedding, or running water. The inmate was provided with a light, toilet, sink, and regular meals. The Eighth Circuit concluded that these conditions did not deny the prisoner the minimal civilized measure of life's necessities. His behavior was threatening, and under the circumstances, these deprivations served legitimate penological goals of preventing injury to himself and others and damage to the facility. Here, Camp had provoked a violent disturbance. The evidence shows that he was fed. His clothing was not removed, as Camp contends, for the purposes of humiliation without legitimate penal concerns. He was stripped to be certain he did not possess a weapon or other contraband. He was shackled to ensure his safety, as well as that of the guards and medical personnel examining him.

Camp, 54 Fed. App'x at 81 (internal citations and quotations omitted).  Similarly, the end of the State DVD shows NSP officers escorting McDowell back to his cell immediately after the cavity search had been conducted, approximately 45 minutes after he and Cruz had initiated the confrontation in the STGMU.  Much like the defendants in Camp, the NSP officers stripped McDowell, not for purposes of humiliation, but to ensure that he "did not possess a weapon or other contraband."  Camp, 54 Fed. App'x at 81.  McDowell does not claim that he was denied food, light, or plumbing in his prison cell.  Nor can he liken the conditions to which he was subjected to a dark, feces-covered cell without the barest essentials.  See Crump v. Taylor, No. 04-328, 2005 WL 139836, at *1 (D. Del. June 14, 2005).  In Williams (relied upon by the Camp panel), the Eighth Circuit reversed a district court's denial of summary judgment on a conditions-of-confinement claim remarkably similar to the instant case.  In granting summary judgment, the court noted that Williams had failed to present any evidence tending to show that he was deprived of the "minimal essentials of life's necessities," even though was denied clothing for four days.  Williams, 49 F.3d at 445.  The court continued:

> Over the course of four days, Williams was given three meals a day, including liquid nourishment in the form of milk, and was sheltered from the elements. While he did not have any clothing or bedding, we have held there is no absolute Eighth Amendment right not to be put in a cell without clothes or bedding. Nothing in the record indicates that Williams suffered any injuries or that his health was impaired as a result of his four-day confinement in the strip cell. At most, Williams's evidence shows only that he felt some discomfort. . . .  In these circumstances, the deprivation of personal property serves the legitimate penological goals of preventing injury to the inmate, injury to corrections officials, and damage to the facility.

Id. at 446.

35

Defendants also submit the testimony of NSP officer Jason Richard.  Officer Richard testified that he personally checked every cell at the STGMU on November 8, 2004, after McDowell and Cruz had been returned to their cell.  When specifically asked whether the inmates had any clothes on, Richard responded, "If they didn't have clothes on I definitely would have noticed that.  They would have to have clothes on."  See Def. Letter Br. Sept. 22, 2008, at 2.  McDowell argues that Richard's testimony does not contradict his own account that he was left naked for two weeks.  Moreover, he argues that Richard's testimony only concerns the first day after the extraction, and does not address any of the other days in the two weeks that McDowell was left naked."  McDowell Letter Br. Sept. 23, 2008, at 3.  The Court disagrees.  Richard's testimony that he would have noticed a naked inmate does not show merely that Richard does not remember whether McDowell had any clothes on, but is better understood as testimony that all inmates he checked were in fact clothed on that day.  Moreover, if McDowell had clothes with him the day after the extraction, then he had clothes with him for the subsequent two weeks—McDowell has not asserted that prison officials confiscated his clothing at any point after November 8, 2008.  Because "neither the relevant law nor the facts support such a claim in this case," Camp, 54 Fed. App'x at 81, summary judgment is proper.

### 4.  Conclusion

The Court grants summary judgment to defendants with respect to all of McDowell's Eighth Amendment claims.  It does so exclusively on the first prong of the Saucier qualified immunity analysis.  On that basis, the Court need not confront the question of whether the constitutional protections that McDowell asserts were clearly established.  See Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); Curley v. Klem, 499

F.3d 199, 207 (3d Cir. 2006) (quoting <u>Scott</u>, 127 S. Ct. at 1774) ("'If, *and only if*, the court finds a violation of a constitutional right,' the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability.") (emphasis added). Because defendants did not violate McDowell's Eighth Amendment rights, the Court will not delve into whether defendants reasonably understood the "contours" of those rights. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).

### C. Retaliation

#### 1. <u>McDowell's Claims</u>

McDowell asserts that defendants violated his First and Fourteenth Amendment rights by retaliating against him in a variety of ways. First, he alleges that defendants ransacked his cell in an effort to thwart his pursuit of civil remedies stemming from the extraction, as well as his appeal of his underlying sentence. <u>See</u> McDowell Opp. Br. at 13. He also claims that he has been charged with several disciplinary infractions that he did not commit in response to his civil action. <u>Id.</u> at 14. He says that certain officers have targeted him in response to his assertion of constitutional rights, and that they have further endeavored to deprive him of requisite administrative grievance forms. <u>Id.</u> at 14-15. Finally, he claims that several officers have threatened him in response to his attempt to administratively grieve the injuries sustained during the November 8 extraction. <u>Id.</u>

#### 2. <u>Analysis</u>

A prisoner alleging retaliatory action in violation of constitutional rights must make a three-part showing. First, the prisoner-plaintiff must show that he engaged in constitutionally protected conduct. <u>Rauser v. Horn</u>, 241 F.3d 330, 333 (3d Cir. 2001). The filing of both a lawsuit and an internal prison grievance form is activity in which in an inmate has a right to be

free from retaliation.  See Allah, 229 F.3d at 224; Robinson v. Taylor, 204 Fed. App'x at 157, 157 (3d Cir. 2006).  Second, a prisoner litigating a retaliation claim must sufficiently demonstrate that he suffered some "adverse action" at the hands of the prison officials. See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000). A prisoner satisfies this requirement by demonstrating that the action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Id. at 225.  The prisoner need not have an independent liberty interest in the relevant privileges, for "[g]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Id. at 224.  Finally, the prisoner must prove that his constitutionally protected conduct was a substantial or motivating factor in the adverse action taken against him.  Rauser, 241 F.3d at 333.  If a plaintiff can make this showing, the burden shifts to defendants to show that they would have taken the same [adverse] action even in the absence of the protected activity.  Id.

At the outset, the Court agrees with defendants that mere verbal harassment does not give rise to a retaliation claim.  Even crediting McDowell's assertion that defendants referred to him as "snitch," "stool pigeon," and "Agent McDowell," he cannot refute the fact that name-calling inflicted absolutely no harm upon him, and as a result the officers' alleged insults could not cause a person of ordinary firmness to decline to exercise his constitutional rights.  (Practically speaking, the videos show a culture of taunts and threats, a culture to which McDowell very much belonged; thus any suggestion that the verbal jabs McDowell now complains of could have resulted in muzzling him is swept away by the open taunting by the inmates that went on during the extraction.)  Moreover, McDowell cannot prevail on a retaliation claim when he bases it on alleged threatening words that never came to fruition.  See McFadden v. Lucas, 713 F.2d 143,

38

146 (5th Cir. 1983) ("[M]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations. . . . Were a prisoner . . . entitled to a jury trial each time that he was threatened with violence by a prison guard, even though no injury resulted, the federal courts would be more burdened than ever with trials of prisoner suits.").

McDowell also claims that he suffered constitutional injury because the officers tore up the administrative grievance forms he had submitted to them.  But the Court fails to see how he was harmed (i.e., how he was prevented from exercising his constitutional rights, see Allah, 229 F.3d at 225).  McDowell himself admits that in response to those submissions, he received numerous Staff Corrective Action Forms requesting that he provide more detailed complaints and accompanying documentation.  The Court is left to wonder how NSP officers could have torn up McDowell's submitted grievance forms—if the officers had actually engaged in the conduct of which McDowell accuses them, then the forms never could have arrived at the proper location.  Moreover, even if some officers had torn up the forms, McDowell suffered no harm as a result because he submitted multiple copies using various media.  In a sense, then, McDowell speaks from both sides of his mouth—he argues that the officers' actions deprived him of the ability to assert his constitutional rights, yet he admittedly continued to assert those rights by repeatedly filing identical administrative grievance forms.  McDowell's own diligence in continuously filing the same grievance forms defeats the implication that defendants' alleged actions were so retaliatory so as to prevent a person of ordinary firmness from asserting his constitutional rights.  Further buttressing this conclusion is the fact that despite the alleged retaliation in response to his pursuit of civil remedies, McDowell was not deterred from filing this lawsuit.  For these reasons, defendants' alleged obstruction of McDowell's filing of

grievance forms does not constitute impermissible retaliation because McDowell cannot prove that any alleged action taken against him was sufficiently "adverse" to sustain a retaliation claim.

Finally, McDowell's retaliation claim that defendants charged him with bogus disciplinary infractions also fails. In adjudicating a § 1983 action, the Court may not consider any facts that imply the invalidity of an inmate's underlying conviction or confinement. Relevant here, any facts used as a basis for McDowell's retaliation claim that impugn the result of the disciplinary proceedings may not be considered unless the finding of guilt has been reversed or otherwise impaired. See Heck v. Humphrey, 512 U.S. 477, 485-87 (1994); see also Edwards v. Balisok, 520 U.S. 641 (1997) (holding non-actionable a § 1983 claim that would imply the invalidity of a prison disciplinary hearing).

In Heck, the Supreme Court considered a state prisoner's § 1983 action challenging the conduct of state officials who had allegedly caused his conviction by improperly investigating his crime and destroying evidence. 512 U.S. 477, 479 (1994). It noted "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." Id. The Court then held that where "establishing the basis for the damages claim necessarily demonstrates the invalidity" of a particular criminal proceeding, id. at 481-82, a § 1983 action will not lie unless the result of that proceeding "has already been invalidated," id. at 487. The Court then added that where the § 1983 action, "even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment . . . the action should be allowed to proceed." Id. The Heck doctrine applies to disciplinary sanctions imposed on inmates pursuant to an intra-prison finding of guilt. See, e.g., Preiser v. Rodriguez, 411 U.S. 475, 489 (1973); Wolff v. McDonnell, 418 U.S. 539, 555 (1974) (distinguishing between a challenge to

the *results* of purportedly invalid disciplinary procedures (barred), and a suit to *prospectively* enjoin disciplinary proceedings alleged to be constitutionally deficient (cognizable)).

In <u>Concepcion v. Morton</u>, 125 F. Supp. 2d 111, 113 (D.N.J. 2000), <u>rev'd on other grounds</u>, 305 F.3d 1347 (3d Cir. 2002), Judge Wolfson granted summary judgment to defendant prison officials accused of using excessive force in subduing an inmate during a prison disturbance much like the one in this case. Concepcion, the plaintiff, was also charged and convicted with disciplinary charges related to the incident and, as McDowell has, he unsuccessfully appealed the disciplinary convictions. <u>Id.</u> at 114. Relying on <u>Heck</u>, the Court refused to hear facts alleged "in support of [his] excessive force claim that would question the validity of the disciplinary judgments against [him]." <u>Id.</u> at 123. Because the plaintiff's disciplinary "finding of guilt ha[d] not been reversed or otherwise impaired," <u>id.</u> (quoting <u>Heck</u>, 512 U.S at 485-87), the Court disallowed particular facts that would "imply the invalidity" of his disciplinary conviction. <u>Id.</u> at 124.

McDowell asserts that the holding in <u>Concepcion</u> is at odds with Supreme Court precedent, relying on <u>Wilkinson v. Dotson</u>, 544 U.S. 74 (2005). <u>See</u> McDowell Opp. Br. at 14 n.2. The Court disagrees. <u>Wilkinson</u> states that the <u>Heck</u> bar to § 1983 relief applies only if "success [in the action] *would necessarily* imply the unlawfulness of a (not previously invalidated) conviction or sentence." 544 U.S. at 81 (emphasis in original). In <u>Wilkinson</u>, the § 1983 plaintiff challenged certain *procedures* used for determining parole eligibility. <u>Id.</u> at 82. The Court distinguished this type of challenge from one which inherently impugns the underlying conviction or confinement. It reiterated that an inmate's § 1983 action is "barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison

41

proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." Id. at 81-82 (emphasis in original).  But because success in the Wilkinson § 1983 action would not have meant "immediate release from confinement or a shorter stay in prison[] [but] . . . at most [a] new eligibility review," the Court found the claim cognizable. Id.

McDowell's situation differs markedly from the plaintiff in Wilkinson.  He does not challenge the *methods* used in the disciplinary proceedings on retaliation grounds; rather, he complains of the very *existence of the charges* themselves.  Were McDowell to succeed on his claim that NSP personnel retaliated against him by conjuring up phony charges, it would not merely implicate, as McDowell claims, factual circumstances unrelated to the validity of the plaintiff's underlying confinement.  See McDowell Opp. Br. at 14 n.2.  To the contrary— McDowell's theory is a complete defense to the charges.  The very essence of McDowell's argument is that the disciplinary charges were completely fabricated in a retaliatory effort to squelch the exercise of his constitutional rights.  Thus, under this arm of his retaliation theory, maintenance of a successful action would necessarily imply the total invalidity of the disciplinary charges.  McDowell was tried and convicted of multiple, unrelated disciplinary infractions.  He filed unsuccessful appeals for all of those guilty findings, and those judgments still stand today.  Because § 1983 is an improper vehicle in which to challenge the disciplinary charges underlying McDowell's retaliation claim, the Court grants summary judgment.

### D.  Fourteenth Amendment

#### 1.  Independent Due Process Claims Asserted by McDowell

In addition to his retaliation claims, McDowell appears to assert stand-alone due process violations stemming from the alleged deprivation of administrative grievance forms by NSP

42

officers.  Enmeshed with his retaliation argument are claims that the alleged refusals to "provide McDowell with the administrative remedy forms and their subsequent refusals to deliver the[m] to prison officials was . . . an interference with McDowell's right to due process in its own right . . . ."  The Court has already disposed of this deprivation-of-forms theory to the extent McDowell advances it in support of his retaliation claim.  See Section IV.C, supra.  The Court now briefly addresses—and rejects—McDowell's passing argument that the alleged deprivation of grievance forms violates due process.

While an inmate's constitutional right of access to the courts is undeniable, see Roman v. Jeffes, 904 F.2d 192, 197 (3d Cir. 1990), it is well-settled that "[i]nmates do not have a constitutionally protected right to the prison grievance process."  Burnside v. Moser, 138 Fed. App'x 414, 416 (3d Cir. 2005) (citing Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991)).  Because a "state grievance procedure does not confer any substantive constitutional right upon prison inmates," Hoover v. Watson, 886 F. Supp. 410, 418 (D. Del. 1995), aff'd, 74 F.3d 1226 (3d Cir. 1995), any alleged denial of administrative grievance forms does not impinge on McDowell's fundamental right to petition this Court for redress.  In Flick, the Eighth Circuit swiftly rejected a federal inmate's Bivens action seeking injunctive relief and damages for denying him access to the prison's internal grievance procedures.  Flick, 932 F.2d at 729.  The court stated that even "[w]hen the claim underlying the administrative grievance involves a constitutional right, the prisoner's right . . . is the right of *access to the courts*, which is not compromised by the prison's refusal to entertain his grievance.  Id. (emphasis added).  The Third Circuit has approved of this assessment: "if the state elects to provide a grievance mechanism, violations of its procedures do not . . . give rise to a § 1983 claim."  Hoover, 886 F. Supp. at 418-19, aff'd, 74 F.3d at 1226.

43

McDowell has not been hindered in any way from availing himself of access to this Court, has had a full and fair opportunity to litigate his case, and has been diligently represented by able counsel.  The Court has fully addressed his complaints on the merits, and thus he has suffered no harm by the alleged deprivation of NSP internal grievance procedures.  Due process simply has not been offended here.

        2.   Incorporated Claims Asserted by McDowell

To the extent that McDowell asserts a deprivation of his constitutional rights under the Fourteenth Amendment because the First, Fourth, and Eighth Amendments are incorporated to the states, see Virginia v. Black, 538 U.S. 343, 358 (2003) (Free Speech Clause applicable to states); Mapp v. Ohio, 367 U.S. 643, 655 (1961) (Fourth Amendment applicable to states); Robinson v. California, 370 U.S. 660, 666-67 (1962) (Cruel and Unusual Punishment Clause applicable to states), summary judgment is granted, as the Court has already disposed of the underlying claims.

**E.  State Constitutional Claim**

The Court has granted summary judgment on all of McDowell's federal claims, and declines to exercise continuing supplemental jurisdiction over the state constitutional claim.  It is therefore dismissed without prejudice.  See 28 U.S.C. § 1367(c)(3); see also Bacon, 232 Fed. App'x 158, 159 (3d Cir. 2007) (supplemental jurisdiction is entirely within court's discretion upon dismissing federal claims).

## V.    CONCLUSION

The Court grants the motion for summary judgment in defendants' favor on all of McDowell's federal claims.  The claims against Administrator Sherrer are dismissed as moot because the Court finds the officers under his charge did not violate the Constitution in the first

instance.  <u>See Baker v. Monroe Township</u>, 50 F.3d 1186, 1190-91 (3d Cir. 1995); <u>Chinchello v. Fenton</u>, 805 F.2d 126, 133 (3d Cir. 1986).   Additionally, because the Court has found the officers' activity constitutionally permissible, McDowell's claims that certain defendants acquiesced in the wrongful activity of their colleagues are not legally cognizable because § 1983 does not provide a cause of action for acquiescing in constitutional conduct.

An appropriate order will be entered.

Date:  October 7, 2008                                    /s/   Katharine S. Hayden

                                                          Katharine S. Hayden
                                                          United States District Judge